IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 05-cv-01948-RPM-KLM

MARKWEST HYDROCARBON, INC.;
MARKWEST ENERGY PARTNERS, L.P.; and
MARKWEST ENERGY APPALACHIA, L.L.C.,

        Plaintiffs,

v.

LIBERTY MUTUAL INSURANCE COMPANY;
BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA;
ARCH INSURANCE COMPANY; and
ACE AMERICAN INSURANCE COMPANY,

        Defendants.
_____

ORDER GRANTING DEFENDANTS' SUMMARY JUDGMENT MOTION
_____

The plaintiffs (collectively "MarkWest") operate a natural gas liquids (NGL) pipeline called the Appalachian Liquids Pipeline System ("ALPS") which was originally constructed and buried in 1957.  MarkWest leases the pipeline and has been responsible for maintenance and operation of it since 1999.  The defendants are first-party property insurers that issued an "all-risks" property insurance policy to MarkWest. A 65-mile segment of the ALPS runs from Maytown Station near Langley, Kentucky, to Ranger Junction in Ranger, West Virginia.  The underground line runs through populated areas and is separated by flow stations each containing a bypass pipe and valve and four-inch raised stem inlet and outlet valves.  The line is constructed of four-inch and five-inch diameter steel pipe.

On November 8, 2004, at approximately 8:15 a.m., MarkWest employee Carl Hunt was performing maintenance at Flow Station Four. The Rolling Acres Subdivision in Ivel, Kentucky, is between Flow Stations Three and Four. Hunt's task was to open the bypass valve, then close the inlet and outlet valves to inspect inside the pipe for pieces of an in-line inspection tool that had been lost inside. Hunt opened the bypass valve and closed the inlet and outlet valves, did the inspection, then reopened the four-inch inlet and outlet valves and closed the bypass valve.

When opening the raised stem inlet valve, Hunt heard a popping noise which was caused by a failure of the valve gate ears so that the valve's hand wheel showed it to be open when it was actually closed. With the closure of the bypass valve, there was a complete stoppage of the flowing liquids being pumped from the Maytown pumping station. The increased pressure caused a release of the NGL through a small hole where the wall of the pipe had been thinned by corrosion. The gas was ignited by an unknown source, resulting in fires, explosions, injuries and the destruction of five homes in the subdivision.

MarkWest's claim for damage to its property was denied by the insurers because of a corrosion exclusion in Paragraph 10.f of the Policy and upon which the defendants rely in their motion for summary judgment seeking dismissal of this civil action for declaratory relief, and for damages for breach of contract and bad faith breach of insurance contract.

There are two separate issues to be decided. The first question is whether the defendants have established that there is no credible evidence to dispute their

contention that corrosion was the "efficient proximate cause" or "efficient moving cause" of the loss. The maximum operating pressure (MOP) of the pipeline when it was built was calculated at 2,340 psig. MarkWest normally operated the line between 900 and 1,300 psig. Before the valve failure, the NGLs were under a pressure of 1,150 psig. At the time of the leak the pressure was estimated to have been approximately 1,370 psig. The defendants contend that because the pressure was substantially less than the MOP, there would have been no NGL escape in the absence of the wall thinning by corrosion.

MarkWest contends that the precipitating cause of the leak was the failure of the inlet valve resulting in a sudden surge of pressure having a hammer effect causing the rupture. There are conflicting expert opinions submitted on this point. The plaintiff has shown a triable issue of fact as to whether this loss would have occurred without the valve failure. Accordingly, the defendants' motion for summary judgment must be denied as to the corrosion exclusion for the loss of property directly resulting from the incident on November 8, 2004. That loss is conceded to be substantially less than the $250,000 deductible under the policy.

The principal claim for damages in this case is the cost and losses incurred by MarkWest in complying with the requirements made by the Office of Pipeline Safety ("OPS") of the Department of Transportation in the exercise of its regulatory authority under 49 U.S.C. § 60112 and 49 C.F.R. § 190.233. On November 18, 2004, the OPS issued a Corrective Action Order to take necessary corrective action "to protect the public, property, and the environment from potential hazards associated with the failure

involving the four and five-inch Maytown Station to Ranger segment" of the ALPS. Exhibit A-14. The OPS waived the requirement of notice and hearing before issuing the order. After finding that MarkWest had informed OPS inspectors of 13 previous leaks that were identified on the pipeline, 11 of which were confirmed to be caused by corrosion, and acknowledging that the cause of the failure on November 8, 2004, had not yet been determined, the OPS said:

> After evaluating the foregoing preliminary findings of fact, I find that the continued operation of the affected segment without corrective measures would be hazardous to life, property and the environment. Additionally, after considering the age of the pipe, the proximity of the pipeline to highways, drinking water sources, and populated areas, the combustible nature of the products the pipeline transports, the pressure required for transporting the material, the history of leaks attributed to corrosion on the pipeline, and the ongoing investigation to determine the cause of the failure, I find that a failure to expeditiously issue this Order requiring immediate corrective action would likely result in serious harm to life, property, or the environment.

Exhibit A-14.

The requirements of the order directed that within 30 days MarkWest must establish an immediate action plan for hydrostatic pressure testing of the Maytown Station to Ranger Junction segment and procedures for leak detection.

On November 18, 2004, the OPS issued an Amendment To Corrective Action Order. Exhibit A-15. It added findings that the ongoing investigation of the incident identified a four-inch raised stem valve that may have played a role in the pipeline's failure and directed an independent investigation of the valve. The amendment did not change the requirements of the original order.

A hearing was held on December 7, 2004, at MarkWest's request for clarification

of the required corrective actions.  The OPS then issued a Post-Hearing Decision Confirming And Second Amendment To Corrective Action Order on March 21, 2005.  Exhibit A-16.  In that order, the OPS granted MarkWest's request for alternative equivalent methods of pipeline integrity testing other than hydrostatic pressure testing.  MarkWest had also requested clarification of what constituted an "integrity threatening condition" and the OPS explained that "corrosion on the pipeline would be an integrity threatening condition" but it did not extend to soil conditions that might be conducive to corrosion.  MarkWest had contemplated the use of an in-line testing device to meet requirements that adequate testing be done by August, 2005, as required under regulations generally applicable to the pipeline.  That device was not ready in time to comply with the OPS order and the hydrostatic testing was done causing the shutdown of the pipeline and the remediation of a number of leaks caused by the increased pressure in the testing procedure.

The Policy provided for coverage of "loss directly resulting from necessary interruption of business caused by destruction of or damage to real or personal property" and "Necessary Extra Expense...incurred by the insured to continue as nearly as practicable the normal operation of the business."  Policy Paragraph 3.A-C.  Additionally, the Policy contains a Demolition and Increased Cost of Construction Endorsement (the DICC Endorsement) providing as follows.

> In the event of loss or damage by an insured peril under this policy that causes the enforcement of any law or ordinance regulating the construction or repair or damaged facilities, the underwriters shall be liable for...[the] [i]ncreased cost of ***repair or reconstruction or the damaged and undamaged*** facility... [and] ... [a]ny increased [sic] in the Business Interruption and extra expense loss arising out of the additional

time required to comply with state law or ordinance.

The endorsement is not restricted to state laws but would cover the losses claimed in this case if it is established that the losses were caused by the damage to the small segment of the pipeline at the site of the leak.

The plaintiffs contend that the OPS orders were issued as a result of the Ivel incident and proffer opinion testimony to that effect. Such opinion testimony would not be admissible. The question must be decided based on the language of the orders and the surrounding circumstances.

The record is clear that MarkWest did not give OPS notice of any of the corrosion leaks that occurred before the Ivel incident. The OPS orders show that OPS was concerned about the effects of corrosion on the integrity of the entire 65 miles of pipeline. The OPS made no mention of testing the valves at the flow stations along the line. The finding of immediacy of the public hazard prompting action without notice and hearing was based on the fact that there were prior leaks and that corrosion was a significant factor in the leak that caused the fire, explosion and injuries to people and property at Ivel.

The corrosion exclusion is applicable to the losses claimed as a result of compliance with the OPS requirements for shutdown, testing and remediation.

The Ivel incident was the cause of the OPS order only in the sense that it gave notice to the OPS that the pipeline had a history of leaks resulting from corrosion. The emergency order was issued before the OPS had any information concerning the possibility of a valve failure as a possible contributing cause of the leak. The only

reasonable inference from reading the three OPS orders is that the investigation and remediation of the 65 mile segment was caused by the evidence of corrosion.  The possibility of a valve failure was not a relevant factor.  There was no order requiring inspection of the valves at the flow stations.  The post-hearing decision was directed to corrosion on the pipeline as a integrity threatening condition that must be eliminated.

Because the damage to the small portion of the pipeline at Ivel and any loss of NPG from the leak on November 8, 2004, is well below the deductible and because the losses sustained as a result of compliance with the OPS regulations are excluded by the corrosion exclusion, the defendants are entitled to summary judgment of dismissal of this civil action.  The plaintiff moved for partial summary judgment on other issues and that motion is denied.

Upon the foregoing, it is

ORDERED that the defendant's motion for summary judgment is granted and judgment will enter dismissing this civil action.  The plaintiffs' motion for partial summary judgment is denied.

DATED: April 23rd, 2008

BY THE COURT:

s/Richard P. Matsch
_____
Richard P. Matsch, Senior Judge